OAO91 (Rev. 12/03)  Criminal Complaint

# UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA
V.
JOSE C. RIOS

**FILED**
AUG 2 4 2006
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

s/Tyrolia Collins

**CRIMINAL COMPLAINT**

Case Number: 06- 7223

(Name and Address of Defendant)

I, the undersigned complainant state that the following s/David G. Bernthal knowledge and belief. On or about **July 2004 to present** (Date) in **Kankakee** County, in the **Central** District of **Illinois** defendant(s) did,

(Track Statutory Language of Offense)
knowingly conspire to distribute cocaine,

in violation of Title **21** United States Code, Section(s) **841(a)(1) and 846**.

I further state that I am a(n) **Special Agent, DEA** (Official Title) and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part of this complaint:  ☒ Yes  ☐ No

s/Tyrolia Collins
Signature of Complainant

Tyrolia Collins
Printed Name of Complainant

Sworn to before me and signed in my presence,

8/23/2006                                             at    Urbana              Illinois
Date                                                          City                  State

David G. Bernthal         U.S. Magistrate Judge           s/David G. Bernthal
Name of Judge             Title of Judge                  Signature of Judge

# AFFIDAVIT

I, Michael Lockwood, after being duly sworn deposes and says as follows:

## Background of Affiant

I, Michael Lockwood, am a Special Agent with the Illinois State Police and has been so employed since October 11, 1999. Prior to working for the Illinois State Police I was employed by the Kankakee County Sheriff's police for approximately 8 ½ years. Affiant has attended the Illinois State Police Training Academy for six months and has attended Lincoln Land Police Training Center for 400 hours. Affiant is a Certified Police Officer in the State of Illinois. Affiant is presently assigned to the Kankakee Area Metropolitan Enforcement Group (KAMEG) and has attended the following advanced Police Training: 32 hour Undercover Investigative Techniques at the Springfield Training Academy, 40 hour Basic Narcotics Investigations, 16 hour Concealment Areas and Searching Techniques, Reid Interview and Interrogation Techniques and have attended 160 hours Basic Investigation course at the Illinois State Police Academy. Affiant has been involved in Investigations that have led up to search warrants and has been involved in executing over one hundred fifty five (155) search warrants. I have investigate criminal violations of the federal narcotics laws, including, but not limited to, Title 21, United States Code, Sections 841, 843, 846, and 848, Title 18 United States Code Sections 1956 and 1957. I have testified in judicial proceedings and prosecutions for violations of controlled substance laws. I have also been involved in the debriefing of defendants, witnesses and informants, as well as other agents and officers who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from drug trafficking.

1. I have become familiar with the methods commonly used to launder money by persons engaged in drug trafficking through training and experience. I have also discussed and compared information that I have about the methods used to launder money with other experienced federal, state and local law enforcement agents. Through training and experience, I have learned that drug traffickers must take steps to conceal their receipts of proceeds that represent the profits received from the operation of their drug trafficking organizations. These steps include hiding large amounts of currency by giving it to others and "laundering" the currency through financial institutions. To disguise their involvement in the transaction, the drug dealers often make use of nominees and/or aliases. Drug traffickers commonly purchase assets with United States currency to reduce or eliminate the paper trail generated by their financial transactions. Frequently, when individuals involved in drug trafficking acquire assets or expend money, they do so using relatives, friends, nominees and/or aliases. These tactics promote the operation of the drug enterprise and conceal or disguise the nature, the location, the source, the ownership, or the control of

the proceeds of the drug enterprise in violation to Title 18, United States Code, Sections 1956 and 1957.

2. Based on information that I have learned from experience and from other KAMEG Agents, State Police Special Agents, Drug Enforcement Administration Special Agents and experienced Internal Revenue Agents, I have learned that many drug dealers maintain the following records of their drug organization at their residence and business property, as well as at the residence of their associates.

a) Books, records, receipts, notes, ledgers, and other papers relating to shell corporations, business fronts and laundered illicit funds.

b) Personal books and papers reflection names, addresses, telephone numbers, and other contact or identification data relating to the laundering of illicit funds.

c) cash, currency and records relating to the money laundered income and expenditures of money and wealth, for example money orders, wire transfers, cashiers checks and receipts, bank statements, passbooks, checkbook and check registers, as well as precious metals such as gold and silver, precious gems such as diamonds and currency counting machines.

d) documents indicating travel in interstate and foreign commerce such as travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motels and hotel receipts, passports and visas, credit card receipts and telephone bills; electronic equipment such as computers, computer components, computer software, external hard drives, monitors, computers, printers, plotters, modems, telex machines, facsimile machines, telephone answering machines to: generate, transfer, count, record and/or store data.

e) Firearms and other dangerous weapons.

3. Based on the knowledge acquired by other experienced KAMEG Agents, Illinois State Police Special Agents, Drug Enforcement Agents and Internal Revenue Agents I have learned that during the course of such residential and commercial property searches, items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises have also been found. Such identification evidence is typical of the articles people commonly maintain in these types of location, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents and keys.

4. Based on your Affiant training and information learned from experienced KAMEG Agents, Illinois State Police Special Agents, Drug Enforcement Administration Special Agents and Internal Revenue Special Agents, it is generally a common practice for drug traffickers to store their drug inventory and drug related paraphernalia (as described above) in their residences as well as locations within the span of their control to include their businesses, and commercial storage locations. Further it is generally a common practice for drug traffickers to maintain in these locations records relating to their drug trafficking activities. Because drug traffickers in many instances will front(that is sell on consignment) controlled substances to their clients, or alternatively will be 'fronted' controlled substances from their suppliers, such record keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

5. It is also generally common practice for drug traffickers to conceal at these locations large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashiers checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained at these locations.

6. As part of my duties and responsibilities as a Special Agent with the Illinois State Police, I have been involved with other agents in an investigation of money laundering of the proceeds of a drug trafficking network operating in Kankakee, Illinois. One aspect of this investigation concerns the drug trafficking and purchasing of various assets by Jose C. Rios, Alias: "CONDI, C & POUNCHO", Date of Birth ██████████

7. Through my own participation in this investigation and through information provided me by Drug Enforcement Administration (DEA) Agents Ty Collins, Robert Rodriguez, Pat Bagley and Jay Borns. I am familiar with all aspects of this investigation. Statements contained in this affidavit are based in part on my personal observations; interviews conducted by law enforcement officers located in Kankakee, Illinois and Chicago Illinois, information provided by confidential sources of information (hereinafter referred to as CS); and my experience and background as a Special Agent of the Illinois State Police.

8. Through surveillances, proffers, confidential informants, and interviews with cooperation defendants I have learned that Jose C. Rios is a high ranking member of a drug trafficking organization responsible for cocaine distribution. RIOS has several enforcers' responsible for collecting narcotic

proceeds for his drug trafficking organization. RIOS's drug trafficking organization distributes quantities of cocaine ranging from ounces to kilograms of cocaine. RIOS heads the organization most commonly distributing four and a half (4 ½) or nine (9) ounces of cocaine to local drug dealers in the Kankakee area. RIOS has been known to distribute up to a kilogram of cocaine to his subordinates. Local drug dealers purchase multi-ounce quantities of cocaine from RIOS. The local drug dealer sells the cocaine for a profit and purchases additional cocaine from the RIOS drug trafficking organization. In some cases the local drug dealer contacts RIOS directly by placing an order for cocaine. RIOS then contacts subordinates who completes the transaction by delivering the cocaine and receiving payment. Subordinates will then meet with RIOS to give RIOS the money.

9. On July 1st, 2004 at approximately 9:59 am, law enforcement agents established surveillance on ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, ▇▇▇▇ RIOS residence. An ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ in a black Ford Truck with Illinois registration of ▇▇▇▇. The truck arrived at ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and ▇▇▇▇▇ entered the residence. At the residence KAMEG C/S 04CS010 purchased approximately 133.6 grams of powdered cocaine for $3,000.00 United States Currency (USC) / Official Advanced Funds (OAF). The C/S also purchased a stolen firearm for $400.00 USC / OAF. After the drug transaction ▇▇▇▇▇ left the residence and was stopped on a traffic stop by Illinois State Police Trooper Robert Swift. ▇▇▇▇▇ was arrested for no valid driver's license and was found to be in possession of $3,000.00 USC / OAF. The money was the same used to purchase the 133.6 grams of cocaine.

10. On December 22nd, 2004 at approximately 4:38 pm, KAMEG C/S # 04CS051 purchased approximately 128.0 grams of cocaine for $3,000.00 USC / OAF from a VIRGIL L. DINKNS. M/W, DOB ▇▇▇▇▇. The purchase took place at DINKINS' residence, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇. The C/S advised that DINKINS supply of cocaine comes from JOSE C. RIOS M/W, DOB. ▇▇▇▇▇ ALIAIS: "CONDI, PONCHO & C" who stays at ▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

11. On January 20th 2005 at approximately 1:15 pm, KAMEG C/S # 04CS010 along with S/A Ty Collins from the DEA purchased approximately 130.2 grams of cocaine for $3,100.00 USC / OAF from a HERIBERTO DIAZ, M/H, DOB. ▇▇▇▇▇ ALIAIS: "BETO". The purchase took place in the vicinity of ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Prior to the deal, surveillance observed a blue Chevrolet Tahoe with Illinois registration of ▇▇▇▇▇ in the rear of DIAZ's residence (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.) The Tahoe left the residence and was driven by JOSE C. RIOS M/W, DOB. ▇▇▇▇▇ Alias: "CONDI". The Tahoe drove to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. After the drug transaction was complete, surveillance observed RIOS leave ▇▇▇▇▇ in his



Tahoe and drive to ███████████████, pet store) and meet with DIAZ. They both entered the store and when they left, DIAZ handed an unknown item to RIOS. Surveillance followed RIOS back to ███████.

12. On June 13, 2005 at approximately 6:30 PM, DEA C/S # 05-119448 / KAMEG C/S #05CS027 was contacted by JOSE C. RIOS, ███████, alias "CONDI", via Nextel Direct Connect (███████). RIOS told the C/S to come to RIOS's trailer (███████████████████████), which is referred to as the "THIRD", with video movies. While at the trailer, the C/S observed a list of people who owed money to GERADO LUGO ███████ alias JOSIE, for cocaine. The C/S also observed several scales in the kitchen cabinets. RIOS had a TV monitor which showed different areas outside of the residence. An unknown white male then delivered a ½ lb of marijuana to RIOS inside the trailer. RIOS gave the C/S approximately 50 grams of marijuana. The C/S then gave the marijuana to KAMEG Agent Michael Lockwood.

13. On August 4, 2005, surveillance observed JOSE C. RIOS's (M/H 71) blue Tahoe parked at his trailer, (███████████████████████). A short time later, surveillance observed ███████, ███████, M/W ███████ driving a tan Land Rover with IL registration 5407058, followed by JAMES A. PLINE, ███████, driving a black Hyundai with Iowa registration ███████, enter the mobile home park. Both vehicles parked at Lot V-12. Approximately 10 minutes later, both the Land Rover driven by ███████ and the Hyundai driven by PLINE, exited the mobile home park. Surveillance was maintained on the Hyundai as it traveled N/B on I-57 then W/B on I-80. On W/B I-80 west of I-55 in Joliet (Will County), Illinois State Police Trooper M. Dixon #4766 stopped the Hyundai for a traffic violation. The driver of the vehicle was identified as JAMES A. PLINE, ███████████████████. PLINE refused the troopers request for consent to search the vehicle. An Illinois State Police K-9 then conducted a "free-air sniff" around the exterior of the Hyundai and the K-9 gave a positive indication for the presence of narcotics inside the vehicle. PLINE was then asked to exit the vehicle and as he did so troopers observed a stun gun on the driver's seat. PLINE was then placed under arrest for Unlawful Use of a Weapon (UUW). A subsequent search of the vehicle incident to arrest resulted in the finding of approximately 520 grams of cocaine wrapped in duct tape inside a cellular telephone box under the passenger seat and approximately 3 grams of marijuana in a plastic cup in the console. Fingerprint analysis on the cocaine package revealed the presence of RIOS's fingerprint.

14. On September 26, 2005 at approximately 3:38 pm, KAMEG C/S #05CS049 contacted a man known as "Whopper", later identified as VALENTIN O. ATILANO, ███████, on his cellular phone ███████. The C/S arranged to purchase 9 oz of powder cocaine from ATILANO for $5,400.00. At approximately 5:52 pm, the C/S picked up ATILANO and drove to ███████

Kankakee, where ATILANO exited the C/S vehicle and entered his green Chevy Tahoe with IL registration ███████ and retrieved a plastic Wal-Mart bag. ATILANO brought the Wal-Mart bag back to the C/S vehicle and gave it to the C/S. Inside the bag was a box of Hefty garbage bags and between the bags was a white plastic wrap which contained approximately 289.3 grams of powdered cocaine. The C/S paid $3,000.00 toward the $5,400.00 owed. Prior to the purchase, surveillance unites observed ATILANO meet with JOSE C. RIOS, M/H ███████, alias CONDI, and CONRADO E. CAMPOS, M/H ███████, at RIOS's trailer (███████████████████████████████). From the trailer, RIOS, CAMPOS and ATILANO drove to Applebee's restaurant (1040 N. Kinzie Ave, Bradley, IL) in a black GMC with IL registration ███████. This vehicle was driven by CAMPOS who is the registered owner. RIOS, ATILANO and CAMPOS left the restaurant a short time later and returned to the trailer, Lot V-12. RIOS then left the trailer and went to Wal-Mart (1260 N Kinzie Bradley, IL). RIOS entered the store, exited a short time later and returned to the trailer. After RIOS returned to the trailer, ATILANO left in a green Chevrolet Tahoe with IL registration ███████ and meets with the C/S.

15. On March 13, 2006, officers executed a state search warrant at a known apartment of RIOS in Cicero, IL. RIOS was present at the time of the search. During the search, officers seized 192 grams of cocaine and $21,480.00 in cash.

16. On June 30th, 2006, S/A Zachary O. Johnston spoke with KAMEG C/S # 06CS036. This CS who stated that within the last 48 hours from June 30th he/she was inside JOSE C. RIOS M/W, ███████ Alias: "CONDI" residence (███████████████████████████). The CS stated that the CS observed RIOS remove a cardboard box from his blue Chevrolet Tahoe and bring it inside the residence. Once inside, RIOS opened the box and it contained two shirts and four plastic bags that contained a white powder, suspected to be cocaine. Each bag of suspected cocaine was the size of a baseball. RIOS removed the bags of suspected cocaine and placed them in containers. RIOS placed the containers in an open void in a hot tub in the residence. The C/S also observed several scales in the kitchen cabinets and some chocolate that contained mushrooms in the freezer. The C/S knows what cocaine looks like and how it is packaged, because they have used cocaine in the past.

On August 3, 2006, RIOS was the subject in an traffic stop by the Illinois State Police that occurred in Berwyn, IL in Cook County. During the stop, RIOS consented to a search of his residence in Berwyn, IL. During a search of RIOS's residence, ALBERTO AVOLOS was present and officers seized $27,000 in cash and 5 grams of marijuana.

17. As a result of my law enforcement experience and this investigation, I am familiar with the ways in which narcotics traffickers such as RIOS conduct their

business, including, but not limited to, their methods of importing and distributing cocaine, their use of numerical codes and code words to conduct their transactions in secret, and their methods of laundering the proceeds of their cocaine trafficking. Through my experience and my discussions with other experienced law enforcement officers, I am familiar with the methods, schemes, and operations used by major cocaine traffickers and know:

a) That such traffickers commonly place assets in names other than their own to avoid detection of these assets by government agencies;

b) That even though those assets are in other person's names, the cocaine traffickers continue to use those assets and exercise dominion and control over them;

c) That cocaine traffickers must maintain, on hand, large amounts of Unites States currency in order to maintain and finance their ongoing cocaine trafficking business;

d) That cocaine traffickers maintain books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering sale, and distribution of cocaine and that such documents may be in code. That traffickers commonly "front" cocaine (meaning they will provide cocaine to their customers on consignment and the customers will pay for it at a later date). That the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the cocaine traffickers have ready access to them, i.e., homes, offices, and automobiles;

e) That it is common for cocaine traffickers to secret contraband, proceeds of cocaine sales, and records of cocaine transactions, sources, and customers, in secure locations within there residences, offices, garages, storage buildings, and safety deposit boxes for ready access, and also to conceal such items from law enforcement authorities;

f) That persons involved in such trafficking conceal caches of cocaine, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in cocaine trafficking activities, in their residences, offices, garages, storage buildings, automobiles, and safety deposit boxes;

g) That cocaine traffickers commonly maintain addresses or telephone numbers in books, papers, pagers, or cellular phones (and often have multiple cellular phones and pagers) which reflect names, addresses, and/or telephone

numbers for their associates in the trafficking organization, even if said items may be in code;

h) That cocaine traffickers frequently take, or cause to be taken, photographs of themselves, their associates, their property, and their product, and that these traffickers usually maintain these photographs in their residences;

i) That when traffickers amass large monetary proceeds from the sale of cocaine, they attempt to legitimize these profits by utilizing foreign and domestic banks and their attendant services, including securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, business fronts and other methods;

j) That it is common for cocaine traffickers to travel to Mexico in order to purchase bulk shipments of cocaine. I know that after purchasing cocaine, the traffickers will transport or cause the cocaine to be transported to the area in which they will sell and distribute it to middlemen. I know that the methods of transportation include, but are not limited to rental automobiles, private automobiles, common carriers such as Federal Express, private trucking companies, or private owned tractor-trailers;

k) That cocaine traffickers sometimes store documents and records relating to their drug supplies, customers, money, and assets on computer hardware and software, the contents of which frequently yield evidence of trafficking and money laundering crimes;

l) That courts have recognized that unexplained wealth is probative evidence of criminal activity in which transactions involving large amounts of cash and high profit margins are common, including trafficking in controlled substances;

m) That it is common for cocaine traffickers to use, carry, and possess firearms and ammunition in the course of their narcotics trafficking to use as protection for themselves and their proceeds and narcotics, and it is common for cocaine traffickers to store and conceal such firearms and ammunition in locations that they control or own, including their own residence or place of work; and

n) That it is common for narcotics traffickers and money launderers to conceal and store items related to their narcotics trafficking and money laundering within safes, footlockers, boxes, containers, and other hidden compartments, and within places that they own or over which they exercise control.

18. There is probable cause to believe that the documents, records and other items set forth in Attachment B of this Affidavit constitute evidence, contraband or fruits of a crime, or property designed for use, intended for use or used in committing violations of Title 21, United States Code, Sections 841(a)(1) and 846, and that a search of ███████████████████████████████, Illinois (described in Attachment A), will result in the discovery of such documents, records and other items. To prevent the removal of destruction of the documents, records and other items indicated in Attachment A, a search of ███ ████████████████████████████████ Illinois should be conducted immediately.

19. Therefore, I respectfully request issuance of a search warrant for documents, records and other items indicated in Attachment B which constitute evidence, contraband or fruits of a crime, or property designed for use, intended for use or used in violations of Title 21, United States Code, Sections 841(a)(1) and 846.

FURTHER AFFIANT SAYETH NOT.

s/Michael Lockwood

Michael Lockwood, Special Agent

Illinois State Police

SUBSCRIBED AND SWORN TO BEFORE ME

This ___ day of _August_, 2006

s/David G. Bernthal

David G. Bernthal

United States Magistrate Judge